IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-167-FL

| | | |
|---|---|---|
| PATRICIA UZZELL, TERESA WHITEHEAD, GENE TAYLOR, and MELISSA HAYMAN, on behalf of themselves and others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MAYOR JEFF JOHNSON, COMMISSIONER JUDY MASON, COMMISSIONER PEGGY LAMM, COMMISSIONER DAVID JOHNSON, and COMMISSIONER MICHAEL BEST, in their individual and official capacities, the TOWN OF LUCAMA, and the CROSSROADS VOLUNTEER FIRE DEPARTMENT, | ) ) ) ) ) ) ) ) ) ) | ORDER |
| Defendants. | ) | |

Plaintiffs maintain this action on behalf of themselves and others similarly situated.[1]  In

the operative, amended complaint filed October 8, 2020, plaintiffs assert claims against all

defendants for violations of the Fourteenth Amendment to the United States Constitution, pursuant

to 42 U.S.C. § 1983, together with violations of 42 U.S.C. §§ 1981, 1982, and 1985, and the North

Carolina Constitution.  They also assert claims under Title VII of the Civil Rights Act of 1964

---

[1]      Plaintiffs assert they bring the instant action on "behalf of all persons who . . . were subjected to discriminatory and unconstitutional treatment by the Town of Lucama because of their race or color and/or . . . their opposition to race and color and other impermissible kinds of discrimination and unconstitutional treatment." (Compl. ¶ 16).

against the Town of Lucama and the Crossroads Volunteer Fire Department ("Fire Department"). Plaintiffs seek compensatory damages, punitive damages, attorneys' fees and costs, as well as injunctive relief.

## BACKGROUND

The action comes now before the court upon defendants' motions to dismiss all claims for lack of subject matter jurisdiction and for failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). Defendants Jeff Johnson, Judy Mason ("Mason"), Peggy Lamm ("Lamm"), Michael Best ("Best"), and the Town of Lucama (collectively "the Lucama Defendants") are aligned in one motion (DE 72). Defendants David Johnson and the Fire Department each filed their own, separate motion to dismiss (DE 66, 70).

For the following reasons, all claims against defendants Jeff Johnson, Mason, Lamm, and Best are dismissed, together with all claims against defendant Fire Department. While defendant David Johnson and the Town of Lucama are successful in many parts of their respective motions, as set forth below, the case will, however, proceed against defendant David Johnson on plaintiff Gene Taylor's ("Taylor") claims for failure to promote and on all plaintiffs' claims for hostile work environment under 42 U.S.C. § 1983. Plaintiffs' § 1983 claim for racially hostile work environment against the Town of Lucama also will proceed.

## STATEMENT OF FACTS

The facts alleged in plaintiffs' amended complaint may be summarized as follows. Plaintiff Patricia Uzzell ("Uzzell") is a member of the Board of Commissioners of the Town of Lucama ("the Board"). Plaintiffs Teresa Whitehead ("Whitehead"), Taylor, and Melissa Hayman ("Hayman") are employees of defendant Town of Lucama. Defendant Jeff Johnson is the mayor of defendant Town of Lucama, a member of the Board, and the assistant fire chief for defendant

2

Fire Department.  He is the son of defendant David Johnson, who is the chief of defendant Fire Department and a member of the Board.  Defendant David Johnson is specifically alleged to have "engaged in direct supervisory responsibility over Town employees including those engaged in performing duties in the public works section, including electrical, water and sewer services, and the employees of the fire department." (Compl. ¶ 53).[2]  The remaining individual defendants are all members of the Board.  Defendant Town of Lucama is a chartered and incorporated town with 11 full-time employees.  Defendant Fire Department is a non-profit corporation that provides emergency services to the Town of Lucama and employs seven part-time firefighter employees.

Plaintiff Uzzell "was the first African-American elected to the [Board]," in November 2017, at which time defendant Town of Lucama had no black employees. (Id. ¶ 33).  Plaintiff Taylor was the first black employee of defendant Town of Lucama and was hired as a public works department employee sometime after plaintiff Uzzell was elected.  Plaintiff Whitehead was hired in April 2019 as defendant Town of Lucama's first black town administrator, which required her to supervise all of defendant Town of Lucama's employees and make decisions that were final, except where the Board intervened.  Plaintiff Hayman is also a black employee hired sometime after plaintiff Whitehead.

In April 2019, around the time plaintiff Whitehead was hired, it came to plaintiff Uzzell's attention that defendant David Johnson had been using racial epithets and making threatening remarks about the town's black employees.  Defendant David Johnson allegedly had been heard multiple times by town employees referring to black town employees as "niggers," despite employees complaining about his use of the racial slur. (Id. ¶ 55).  Defendant David Johnson is also alleged to have made threatening comments in the presence of town employees, stating that

---

[2]     For ease of reference, the court references "Compl." to mean the operative complaint — again, that is plaintiffs' amended complaint filed October 6, 2020.  (Am. Compl. (DE 62)).

3

"he would blow someone's brains out with a gun because he 'didn't get people back,' instead he 'got even.'" (Id. ¶ 69). Finally, on August 26, 2019, when asked to do a fire inspection for a citizen of the town, defendant David Johnson allegedly inquired, "if the citizen for whom they were doing the inspection was Black." (Id. ¶ 55).

Later in September 2019, plaintiff Taylor, who was responsible for the town's electrical equipment and lines, "learned that another employee who was White but who has less seniority . . . had received a raise," despite defendant David Johnson remarking previously that no employees would be receiving a raise. (Id. ¶¶ 71-72). Plaintiff Taylor had been hired after a previous employee who worked as a lineman quit employment. The employee who later received a raise had been instructed to teach plaintiff Taylor how to perform lineman duties, but defendant David Johnson directed the employee not to teach plaintiff Taylor. That employee received his raise because he was able to perform lineman duties.

On October 15, 2019, town employees witnessed more uses of racial epithets by defendant David Johnson. According to the complaint, he described plaintiff Hayman, who had just been hired, "as a 'monkey nigger,'" plaintiff Whitehead as a "'stupid nigger,'" and plaintiff Uzzell "as a 'nigger.'" (Id. ¶ 75). He allegedly stated to another employee around the same time that "he had to get rid of all the 'niggers.'" (Id. ¶ 76). According to the complaint, defendant David Johnson referred to other "Black town employees as . . . 'black little niggers.'" (Id. ¶ 77). He is alleged to have also used the term "lazy nigger" and further commented that "we have to get those niggers out of town hall." (Id. ¶ 81).

The incidents in October resulted in a flurry of official and unofficial actions. "[T]he increasing tension over [defendant David Johnson's] remarks and use of racist epithets" allegedly caused the town's mayor, presumably the predecessor to defendant Jeff Johnson, to resign in

October 2019. (Id. ¶ 79). And defendant David Johnson's conduct resulted in the town's attorney having an extended conversation with him directing him "to stop making racist remarks about African Americans." (Id. ¶ 80). Plaintiff Whitehead raised the issue to the Board at a December 2, 2019, meeting. She informed the Board that defendant David Johnson's remarks had "negatively impacted employee morale" and left employees feeling threatened. (Id. ¶ 82). She asked the Board to take action to rectify the situation.

However, plaintiffs allege that the situation was not rectified or addressed and that the situation remained tense. Defendant Mason visited plaintiff Whitehead's office on December 30, 2019, and asked when she would be able to sign checks on behalf of the town. Defendant Mason complained that "it has been long enough, and I am not saying this because of the color of your skin." (Id. ¶ 84). Similarly, in January 2020, defendant Lamm visited town hall and had a conversation with plaintiff Whitehead during which defendant Lamm allegedly commented that plaintiff Whitehead's name should, instead, be "Blackhead." (Id. ¶¶ 85-86).

At a January 6, 2020, meeting of the Board, multiple residents called for defendant David Johnson to "step down because of his racist remarks and his threatening behavior." (Id. ¶ 87). One resident "recounted an incident when [defendant David Johnson] threatened her at the post office." (Id. ¶ 87). At this meeting, a member of the Board "resigned her position . . . stating that she could not with a clear conscience sit on the Board . . . 'knowing what they are doing or saying.'" (Id. ¶ 88). The resigning member further stated her belief that "the use of the 'N-word' had surfaced as an ongoing issue" in 2017 when plaintiff Uzzell was first elected and that "the Board had taken no action to discipline [defendant David Johnson], remove[] him from his Commissioner position, or to reassure either citizens or Town employees that they or their property were not in any danger due to their race." (Id. ¶ 89).

At a February 3, 2020, meeting of the Board, a citizen raised concerns about the use of racial epithets once again and asked, "how they planned to address the allegations." (Id. ¶ 90). At this meeting, defendant David Johnson denied ever having used racial epithets. The citizen also recounted an incident during which defendant Fire Department under the supervision of defendants David Johnson and Jeff Johnson "refuse[d] to provide assistance . . . and to touch [a black citizen] even though she was bleeding from her nose and her mouth." (Id. ¶ 91).

As he had previously, defendant David Johnson, during a subsequent inspection of a different property, allegedly asked a town employee "if the person they were going to see was black or white." (Compl. ¶ 92). In the same conversation, according to the complaint, defendant David Johnson informed the employee "that none of the Blacks were speaking to him but that he was not 'losing any sleep over it.'" (Id.). He further stated that "he was going to find out who reported him to the EEOC." (Id.).

In March 2020, plaintiffs Whitehead and Uzzell "were required by . . . [d]efendants to leave an official Town Board meeting in order for . . . [d]efendants to consult with the Town attorney." (Id. ¶ 94). The participants in that meeting "intentionally turned off the recording of the meeting in order to conceal the discussion from the public." (Id.). Plaintiff Uzzell alleges that, as an elected commissioner, she "was entitled as a matter of law to be present at any session of the . . . Board." (Id.).

Plaintiff Whitehead determined on June 12, 2020, that the Town's public records were missing from "the 1990s" and was informed by a Town employee that the employee allegedly had been directed by defendant David Johnson to "d[i]g a hole and bur[y] town documents," which he did. (Id. ¶ 99).

6

On June 16, 2020, plaintiffs Whitehead and Hayman learned that the Board had approved adjustments to the electric bills of certain citizens. On their investigation, the only citizens that had been granted adjustments were white citizens. The practice appears to "have been ongoing for many years," but the above-mentioned destruction of town records made it difficult to determine. (Id. ¶ 105).

Since the initiation of the instant case, defendant Jeff Johnson has "refused to interact" with plaintiff Whitehead, "essentially bypass[ing] her and conduct[ing] the Town's business from the Fire [D]epartment without communicating to any substantial extent with" plaintiff Whitehead. (Id. ¶ 50).

Additional alleged facts pertinent to the motions will be discussed in the analysis below.


## COURT'S DISCUSSION

A.     Standard of Review

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. Such motion may either 1) assert the complaint fails to state facts upon which subject matter jurisdiction may be based, or 2) attack the existence of subject matter jurisdiction in fact, apart from the complaint. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). When a defendant challenges the factual predicate of subject matter jurisdiction, a court "is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). The nonmoving party in such case "must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." Id.

7

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

B.     Analysis

       1.     Plaintiffs' Article III Standing

       As a preliminary issue, the court first considers whether plaintiffs have the requisite Article III standing to invoke the court's jurisdiction over their claims against any of the defendants.

       "[A] party invoking the jurisdiction of a federal court [must] seek relief for a personal, particularized injury," that is, the party must have individual standing to bring a suit before the court. See Hollingsworth v. Perry, 570 U.S. 693, 715 (2013). "To meet the constitutional minimum for standing, '[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 154 (4th Cir. 2000) (alteration in original) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). The injury must be personal, meaning that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490,

8

499 (1975); see also Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018) ("At least one plaintiff must demonstrate standing for each claim and form of requested relief."). "The party invoking federal jurisdiction bears the burden of establishing standing." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158, (2014) (quotation omitted).

Because defendants' facial challenge to plaintiffs' standing to bring their claims does not dispute the jurisdictional facts in the complaint (here, the alleged injuries), the court accepts the facts of the complaint as true as it would in the context of a Rule 12(b)(6) challenge. See Adams, 697 F.3d at 1219. However, the burden of proof remains on plaintiffs to establish standing to sue. See, e.g., Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992) ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.").

Plaintiffs highlight a variety of potentially injurious conduct by defendants: "forgiveness of municipal utility bills; the illegal destruction of public documents; . . . the emergency responses to citizens; decisions regarding the hiring, compensation, training, and other terms and conditions of Town employment." (Pls.' Resp. (DE 77) at 32; see also id. at 10 (highlighting as relevant the "provision of emergency services and fire inspections based on race")).[3] However, plaintiffs must show injury to themselves cognizable under Article III. Blum v. Yaretsky, 457 U.S. 991, 999 (1982) (explaining that a "plaintiff who has been subject to injurious conduct of one kind [does

---

[3]    In so far as the complaint alleges an injury of circumventing plaintiff Whitehead's authority as town administrator or plaintiff Uzzell's being expelled from a Board meeting, (see, e.g., Compl. ¶¶ 94-95), plaintiffs do not tie these alleged injuries to any of their claims. See Davis v. FEC, 554 U.S. 724, 734 (2008) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (quotation omitted)). See generally Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 473 (1982) ("Were the federal courts merely publicly funded forums for the ventilation of public grievances . . . the concept of 'standing' would be quite unnecessary.").

9

not] possess by virtue of that injury the necessary stake in litigating conduct of another kind"). The majority of these asserted injuries are not the plaintiffs' personal injuries.

For example, plaintiffs do not allege that their municipal utility bills were denied adjustment.[4]  Nor do they allege that responses to their emergency calls were denied.  Despite plaintiffs' focus on this alleged harm, (see, e.g., Pls.' Resp. (DE 77) at 36-40), the complaint does not allege that this injury was suffered by any of the plaintiffs.  (See e.g., Compl. ¶¶ 65-68 (describing non-party Annette Flowers's experience), 91 (describing an unnamed citizen's experience); Pls.' Resp. (DE 77) at 38 ("Plaintiffs have alleged two separate incidents of the denial of equal emergency services to citizens of the Town of Lucama . . . .")).  Plaintiffs thus fail to allege an irreducible constitutional requisite for standing.  See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) ("The plaintiff must have . . . suffered an injury in fact . . . ." (emphasis added)).

The fact that plaintiffs might have emergency services denied to them in the future is insufficient for standing purposes.  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." (emphasis added) (quotation omitted)).  Further, plaintiffs' fear that such services could potentially be denied to them on the basis of their race at some point in the future also fails to constitute injury-in-fact.  See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) ("[T]hreatened injury must be certainly impending to constitute injury in fact, and . . . allegations of possible future injury are not sufficient." (quotations omitted)).  The

---

[4]    "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, . . . [t]he 'injury in fact' . . . is the denial of equal treatment resulting from the imposition of the barrier." Bostic v. Schaefer, 760 F.3d 352, 372 (4th Cir. 2014) (quoting Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666 (1993)).  However, to show that this injury in fact is sufficiently tangible, the members of the excluded group must "show that they are 'able and ready' to seek the opportunity." Cf. Townes v. Jarvis, 577 F.3d 543, 548 (4th Cir. 2009).  To the extent plaintiffs' theory of injury relates to the so-called "unconstitutional emoluments," (Pls.' Resp. (DE 77) at 3), they have not alleged sufficient factual matter for a reasonable inference to arise that they sought adjustments to utility bills or that they were denied opportunity to do such, in fact or in effect.

10

fact that the injuries alleged by plaintiffs might be relevant to unidentified, potential class members does not alter the court's analysis. See Pashby v. Delia, 709 F.3d 307, 316 (4th Cir. 2013) ("When the case is a class action lawsuit, the named class representatives 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'" (quoting Blum, 457 U.S. at 1001 n.13)).

Additionally, a violation of a generalized right to access to town records, (see, e.g., Compl. ¶ 97), is the exact kind of generalized grievance the Supreme Court has guided does not constitute the type of injury required for standing. Warth v. Seldin, 422 U.S. 490, 499 (1975) ("[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction."); Bishop v. Bartlett, 575 F.3d 419, 423 (4th Cir. 2009); Parkridge 6, LLC v. U.S. Dep't of Transp., 420 F. App'x 265, 268 (4th Cir. 2011).

The only injuries in fact suffered by plaintiffs, taking their allegations in the complaint as true, are adverse decisions regarding plaintiff Taylor's employment conditions with defendant Town of Lucama, (see, e.g., Compl. ¶ 74), and employment-related grievances caused by defendant David Johnson's alleged conduct.[5] See generally Thompson v. N. Am. Stainless, LP, 562 U.S. 170, 178 (2011).

Plaintiffs argue that, by analogy to the United State Court of Appeals for the Fourth Circuit's opinion in Wikimedia Foundation v. NSA, 857 F.3d 193 (4th Cir. 2018) and Carcaño v. Cooper, 350 F. Supp. 3d 388 (M.D.N.C. 2018), they have been injured by the alleged denial of emergency services on the basis of race. (Pls.' Resp. (DE 77) at 38-40). However, neither case contemplated the type of injury plaintiffs assert here.

---

[5] Whether such an alleged injury states a claim under plaintiffs' causes of action is a separate question and discussed later herein.

11

For example, in <u>Wikimedia</u>, the Fourth Circuit explicitly held that plaintiff's allegation that the NSA was seizing plaintiff's own communications through surveillance, allegedly violative of the Fourth Amendment, constituted "concrete and particularized" injury "despite '[t]he fact that [it is] suffered by a large number of people.'" 857 F.3d at 209-10 (alterations in original) (quoting <u>Spokeo</u>, 136 S. Ct. at 1548 n.7). In contrast, here, plaintiffs' allegation of emergency service denial is not one that plaintiffs distinctly have suffered themselves, but rather an injury presented as suffered by a number of other people, not including them. Such a situation is far afield from <u>Wikimedia</u>, despite plaintiffs' textually unmoored description of that case. (<u>See</u> Pls.' Resp. (DE 77) at 38 (describing themselves as "more akin to the plaintiffs in Wiki[m]edia who are entitled to use the internet without fear of government interception and surveillance")).

Plaintiffs analogize their alleged injury to that of plaintiffs in <u>Carcaño</u>, asserting that

> [p]laintiffs in this case have standing because they can show that because of the barrier of having emergency services controlled by [defendant Fire Department] run by a person with racial animus, [defendants Town of Lucama and Fire Department] have made it "more difficult for a certain people to receive a benefit than for those outside that class" and that itself has created an injury in fact.[]

(Pls.' Resp. (DE 77) at 39 (quoting <u>Carcaño</u>, 350 F. Supp. 3d at 410)). As <u>Carcaño</u> recognized, "the denial of equal treatment resulting from the imposition of a barrier that makes it more difficult for a certain class of people to receive a benefit than for those outside that class <u>may</u> create an injury in fact." <u>Carcaño</u>, 350 F. Supp. 3d at 410 (emphasis added) (citing <u>City of Jacksonville</u>, 508 U.S. at 666). However, as already noted, plaintiffs have not shown they are in the same position as the <u>Carcaño</u> or <u>City of Jacksonville</u> plaintiffs, who were "able and ready" to attempt to receive the benefit. <u>See</u> <u>City of Jacksonville</u>, 508 U.S. at 666; <u>Carcaño</u>, 350 F. Supp. 3d at 410 (discussing plaintiffs who "plaintiff can demonstrate that he or she <u>has the intention</u> to take a particular lawful action"). Nor have plaintiffs shown that challenges to set-aside programs and challenges to a

12

prohibition on local anti-discrimination ordinances and regulations are so similar to the instant alleged injury to have the "imposition of a barrier" injury theory apply to them.

In sum, plaintiffs fail to allege facts supporting that they have standing to challenge the allegedly wrongful conduct of the denial of emergency services, utility bill emoluments, biased fire inspections, and destruction of public records under the causes of action asserted and for the relief requested. Therefore, claims based on those injuries are beyond the subject matter jurisdiction of the court. Accordingly, the court restricts its Rule 12(b)(6) analysis to plaintiffs' alleged injuries-in-fact related to their employment.

     2.     David Johnson's Motion to Dismiss (DE 66)

     a.     Section 1983 Claims

"Section 1983 is not itself a source of substantive rights, but rather provides a method for vindicating federal constitutional and statutory rights." Jones v. Chandrasuwan, 820 F.3d 685, 691 (4th Cir. 2016). Likewise, "when suit is brought against a state actor, § 1983 is the exclusive federal remedy for violation of the rights guaranteed in § 1981." Dennis v. County of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995) (quotations omitted). Accordingly, "[t]he first step in any such claim is to identify the specific constitutional [or statutory] right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994). Plaintiffs cite as relevant the rights to equal protection and due process stemming from the Fourteenth Amendment and those statutory rights enshrined in § 1981. (See Compl. ¶ 109). The court addresses each in turn below.

     i.     Equal Protection Clause

"The Equal Protection Clause, which prohibits States from denying persons the equal protection of the laws, keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Fauconier v. Clarke, 966 F.3d 265, 277 (4th Cir. 2020)

(quotations omitted). "[T]o state a claim for violation of the [Equal Protection] Clause, a plaintiff must plausibly allege first that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Id. Further, plaintiffs must plausibly allege that "the disparity was not justified under the appropriate level of scrutiny." Id.

"Courts may apply the standards developed in Title VII litigation to similar litigation under § 1983." Beardsley v. Webb, 30 F.3d 524, 529 (4th Cir. 1994); see Wilcox v. Lyons, 970 F.3d 452, 462 (4th Cir. 2020) ("Title VII's antidiscrimination provision overlaps the ambit of the Equal Protection Clause, and we have applied a similar framework in analyzing workplace protected-characteristic discrimination claims under each . . . ."); Gairola v. Com. of Va. Dep't of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir. 1985) ("Under Title VII and either § 1981 or § 1983, the elements of the required prima facie case [of employment discrimination] are the same.").[6]

### 1) Adverse Employment Action

In order to state a claim for discrete employment discrimination, a plaintiff must allege "[a]n adverse employment action, [which] is a discriminatory act that adversely affects the terms, conditions, or benefits of the plaintiff's employment." Holland v. Wash. Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) (quotation omitted). Typically, adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999).

---

[6]     Because "[t]he elements of a claim under § 1981 or § 1983 mirror those of Title VII," and accordingly mirror one another, see McCray v. Pee Dee Reg'l Transp. Auth., 263 F. App'x 301, 305 (4th Cir. 2008), the court's analysis of the pertinent equal protection issues is equally applicable to plaintiffs' § 1983 claims for § 1981 violations.

14

Here, apart from a hostile work environment, plaintiffs Uzzell, Whitehead, and Hayman fail to point to any discrete adverse employment action that has caused them harm.[7] The complaint does not allege that they were fired or reassigned. As to the allegation that defendant David Johnson asserted "that no employees were going to receive a raise," the complaint fails to allege in conjunction that other employees similar to plaintiffs Uzzell, Whitehead, and Hayman were treated differently; the crux of any equal protection claim. Fauconier, 966 F.3d at 277; see also Alexander v. Estepp, 95 F.3d 312, 317 (4th Cir. 1996) (explaining because plaintiffs did not show that the allegedly discriminatory employment action "cause[d] them to be denied employment opportunity, the plaintiffs . . . may not be awarded any personal relief" under §§ 1981 and 1983).

However, this is not true in regard to plaintiff Taylor. The complaint specifically alleges that he was denied a promotion and related raise due to defendant David Johnson's conduct. Plaintiff Taylor expressed interest in becoming a "lineman," which was associated with a related "increase in his wages." (Compl. ¶¶ 73-74). A more junior employee, who ended up receiving the lineman-related wage increase, allegedly was instructed both by his supervisor and the town administrator, presumably plaintiff Whitehead, to train plaintiff Taylor how to be a lineman. (Id.). However, the complaint alleges that the employee refused to train Taylor at the direction of defendant David Johnson, who is alleged to have exercised de facto control over the public works department. (See Compl. ¶¶ 53, 74).

This direction, which prejudiced plaintiff Taylor's ability to receive a raise, taken in conjunction with the pervasive racial comments by defendant David Johnson about the town's black employees and the specific comment that he believed "that the Town needed to get rid of the 'niggers,'" (Compl. ¶ 77), raises a reasonable inference that there was a causal nexus between

---

[7]    The court considers separately below whether plaintiffs have alleged a level of hostile workplace conduct such that it could be said to affect the terms and conditions of their employment.

defendant David Johnson's direction to the other public works employee, which denied the opportunity for a raise and/or a promotion, and discriminatory intent on his part. See, e.g., Lettieri v. Equant, Inc., 478 F.3d 640, 649 (4th Cir. 2007) (explaining that "evidence that clearly indicates a discriminatory attitude at the workplace" can help "illustrate a nexus between that negative attitude and the employment action" (quotation omitted)).

Further, even if defendant David Johnson's comments are not sufficient direct evidence of discriminatory intent in the denial of a promotion for plaintiff Taylor, they would constitute sufficient indirect evidence at this stage to support a reasonable inference that defendant David Johnson, as the relevant decisionmaker, was motivated by racial bias. See McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 586 (4th Cir. 2015); Williams v. Giant Food Inc., 370 F.3d 423, 430 (4th Cir. 2004) (explaining a claim for failure to promote may be based upon allegations that "(1) [plaintiff] is a member of a protected group, (2) there was a specific position for which she applied, (3) she was qualified for that position, and (4) [defendant] rejected her application under circumstances that give rise to an inference of discrimination").

In sum, plaintiff Taylor sufficiently has alleged direct evidence of discriminatory intent in the denial of an employment opportunity to state a § 1983 claim against defendant David Johnson on that basis.

2)  Hostile Work Environment

To state a claim premised upon hostile work environment, a plaintiff must allege:

(1) he experienced unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.

16

Perkins v. Int'l Paper Co., 936 F.3d 196, 207-08 (4th Cir. 2019).[8]  "[W]hen determining whether the harassing conduct was objectively severe or pervasive, we must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008).  "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor" because "a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals."  Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 278 (4th Cir. 2015) (alteration in original) (quotation omitted).

It is well understood that "the word 'nigger' is pure anathema to African Americans" and "[f]ar more than a 'mere offensive utterance.'"  Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001); see also Savage v. Maryland, 896 F.3d 260, 277 (4th Cir. 2018) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." (quotation omitted)).  "[S]imilarly odious" is the "use of the word 'monkey' to describe African Americans."  Spriggs, 242 F.3d at 185.

With this in mind, the Fourth Circuit has concluded that a jury reasonably could find a hostile work environment existed where a plaintiff was exposed on a daily basis to "incessant racial slurs, insults, and epithets" by his supervisor, some directed at him and others directed at fellow black employees. See Spriggs, 242 F.3d at 182, 184-86.  Similarly, a "reasonable jury could find

---

[8]     "[W]hile a plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss, '[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  Coleman v. Maryland Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (second alteration in original) (quoting Twombly, 550 U.S. at 555) (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510-15 (2002)), aff'd, 566 U.S. 30 (2012).

that [a supervisor's] two uses of the 'porch monkey' epithet—whether viewed as a single incident or as a pair of discrete instances of harassment—were severe enough to engender a hostile work environment." Boyer-Liberto, 786 F.3d at 280; see also, e.g., White v. BFI Waste Servs., LLC, 375 F.3d 288, 298 (4th Cir. 2004) (reversing grant of summary judgment on plaintiffs' hostile work environment claim where "plaintiffs have forecasted evidence that workplace supervisors repeatedly used the term 'nigger' and 'monkey,' as well as other insulting terms, to refer to black employees").

Here, all of the plaintiffs state such a claim against defendant David Johnson. He is alleged to have used the term "nigger" in various iterations over the course of a month to describe black employees of the town, including, specifically, plaintiffs. (See, e.g., Compl. ¶¶ 75-77 (alleging that defendant David Johnson specifically described plaintiff Hayman as a "monkey nigger," plaintiff Whitehead as a "stupid nigger," plaintiff Uzzell as a "nigger," and that he stated that other "Black Town employees . . . [were] 'black little nigger[s]'"). And the complaint implies that this has been an issue over the course of multiple years, although it only describes specific instances in and around October 2019. (See, e.g., id. ¶ 75-77, 89).

Also relevant to the inquiry is that defendant David Johnson's alleged use of racial epithets was combined with threats regarding plaintiffs' employment status. (See id. ¶¶ 76, 77, 81) (recounting defendant David Johnson's alleged statement that "he had to get rid of all the 'niggers,'" that "the Town needed to get rid of the 'niggers,'" and that "we have to get those niggers out of town hall")). Further, although not racially charged on their own, the other physically threatening comments ostensibly made by defendant David Johnson, such as comments that he would "blow someone's brains out with a gun" if they had wronged him, would further contribute to the abusive and hostile nature of the work environment. (See Compl. ¶ 69).

That not every comment is alleged to have been about plaintiffs may impact the severity of the harassing conduct in some cases, but, here, where racial epithets were repeated about various "African American" or "Black" employees as well as plaintiffs and to refer to all of the "Town employees who were Black," the severity of the racially offensive conduct is not lessened. Spriggs, 242 F.3d at 184 ("Although [defendant] contends that conduct targeted at persons other than [plaintiff] cannot be considered, its position finds no support in the law. We are, after all, concerned with the 'environment' of workplace hostility, and whatever the contours of one's environment, they surely may exceed the individual dynamic between the complainant and his supervisor.") And, in reference to plaintiffs Hayman, Whitehead, and Taylor, who were under the supervisory control of the Board, which included defendant David Johnson, the fact that these epithets came from one in a position of power over them furthers the severity of the harassing conduct. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 763 (1998) ("[A] supervisor's power and authority invests his or her harassing conduct with a particular threatening character.").

Allegations of repeated use of unambiguous, discriminatory epithets by defendant David Johnson are joined by ones appearing to highlight his fixation on race when assessing duties in his role as a municipal official. (See, e.g., Compl. ¶ 55 (alleging that when defendant David Johnson was tasked with a certain fire inspection, he first wanted to clarify whether the citizen-to-be-inspected "was Black"), ¶ 92 (asserting similar conduct as part of a property inspection and alleging that defendant David Johnson stated that "none of the Blacks were speaking to him but that he was not 'losing any sleep over it'")). See generally Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995) (explaining that race is "a group classification long recognized as in most circumstances irrelevant and therefore prohibited" (quotation omitted)). This other alleged factual matter, taken on its own, might not evidence objectively severe or pervasive harassment

but is permissibly taken into account in weighing the totality of the circumstances. Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 197 (4th Cir. 2000) ("The more serious incidents enumerated here were complemented by numerous additional occurrences that, in isolation, may have seemed less problematic, but which actually served to exacerbate the severity of the situation."). Under the circumstances at issue, plaintiffs have alleged factual allegations raising their right to relief on a theory of a racially hostile work environment above a speculative level.

Defendant David Johnson nonetheless asserts that "merely hearing a racial epithet" is not "actionable as a violation of one's constitutional rights" and that "there are no allegations that any of these [p]laintiffs actually heard [defendant David Johnson] utter such remarks." (Def. David Johnson's Mem. (DE 67) at 7). Neither argument requires dismissal of plaintiffs' hostile work environment claims.

First, even accepting that racial epithets uttered in the abstract may not infringe on constitutional rights, see, e.g., Carter v. Morris, 164 F.3d 215, 219 n.3 (4th Cir.1999) (noting that the use of racial epithets does not support an excessive force claim), in the context of employment, the alteration of a plaintiff's conditions of employment on an impermissible basis is the concrete injury suffered when a plaintiff is subjected to an abusive working environment. Cf. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).

And as to defendant David Johnson's assertion that the fact that the plaintiffs did not hear any of the actual utterances implies a lack of injury, Fourth Circuit law clearly precludes such an argument. Perkins, 936 F.3d at 210 (explaining that "the fact that an employee does not witness statements made to third parties does not bar their consideration" and that "the evidence of racially offensive conduct that [plaintiff] heard about second-hand should not be disregarded simply because he did not witness it"); Ziskie v. Mineta, 547 F.3d 220, 224 (4th Cir. 2008) (rejecting

defendant's argument "that only offensive language used in the plaintiff's presence is relevant to her hostile environment claim" as "inconsistent with the principles we have established in our precedent"). In sum, plaintiffs have stated § 1983 claim premised upon hostile work environment against defendant David Johnson.

ii.      Retaliation

"A plaintiff can prove illegal retaliation under . . . § 1981 if he shows that (1) he engaged in protected activity, (2) he suffered an adverse employment action at the hands of [his employer]; and (3) [the employer] took the adverse action because of the protected activity." Bryant v. Aiken Reg'l Med. Centers Inc., 333 F.3d 536, 543 (4th Cir. 2003) (alterations in original) (quotation omitted). At this stage, "to state a § 1981 retaliation claim, a plaintiff must allege facts rendering it plausible that, but for her participation in protected activity, she would not have suffered a materially adverse action." Ali v. BC Architects Engineers, PLC, 832 F. App'x 167, 172-73 (4th Cir. 2020).

Plaintiffs point to no specific, retaliatory conduct in their complaint or in response to the instant motions. (See Pls.' Resp. (DE 77) at 20-25). Assuming that the comments undergirding this claim are those by defendant David Johnson that "he was going to find out who reported him to the EEOC," plaintiffs have failed to point to a materially adverse action tied to any impermissibly retaliatory intent. (Compl. ¶ 92). Nor does review of the complaint reveal any non-conclusory allegations of retaliation relating to materially adverse employment actions. (See, e.g., Compl. ¶¶ 84 ("Upon information and belief, town employees opposing the racist environment have been subjected to . . . retaliation for resisting or opposing Defendant David Johnson's racist statements or actions."), 108 ("Defendants have retaliated against [p]laintiffs based on their

21

complaints about illegal discrimination . . . .")).  In sum, plaintiffs fail to state a claim for retaliation against defendant David Johnson, and plaintiffs' retaliation claim is dismissed without prejudice.

### iii. Due Process

Plaintiffs assert due process violations as part of their § 1983 claim.  The Due Process Clause prohibits government actors from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  "Due process contains both substantive and procedural components.  Procedural due process prevents mistaken or unjust deprivation, while substantive due process prohibits certain actions regardless of procedural fairness." Snider Int'l Corp. v. Town of Forest Heights, 739 F.3d 140, 145 (4th Cir. 2014).  "Section 1983 provides a cause of action for public employees who are deprived of their constitutionally-protected property or liberty interests without due process of law." Harrell v. City of Gastonia, 392 F. App'x 197, 202-03 (4th Cir. 2010).  However, the right to substantive due process has clearly delineated and tightly circumscribed boundaries.  See, e.g., County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998) ("Because we have always been reluctant to expand the concept of substantive due process, we [have] held . . . that where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (quotations omitted)); Albright, 510 U.S. at 272 ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity.").

Plaintiffs do not identify a liberty or property interest that plaintiffs have been deprived beyond a general right to be free of "arbitrary and capricious government action" and the conclusory assertion that they have suffered damages to their "good names, reputations, honor,

and integrity." (Compl. ¶¶ 109, 117); cf. Maldonado-Guzman v. Sessions, 715 F. App'x 277, 284 (4th Cir. 2017) ("A party who is unable to identify a property or liberty interest cannot successfully assert a due process claim."). Their response does not identify any pertinent interests. (See e.g., Pls.' Resp. (DE 77) 27-34).[9] Nor do plaintiffs point to any procedure which should have been given that was not. Plaintiffs fail to state a procedural due process claim. Cf. Prieto v. Clarke, 780 F.3d 245, 248 (4th Cir. 2015) ("Because we conclude that [plaintiff] cannot establish a protected liberty interest, we need not consider the sufficiency-of-process requirement.").

The two potential theories of due process violations identified by plaintiffs are not supported by sufficient factual matter in the complaint, even ignoring their failure to identify a relevant liberty or property interest associated with the alleged deprivations.

First, plaintiffs' complaint fails to state a claim under a theory of arbitrary governmental action violative of their substantive due process rights. Rucker v. Harford County, 946 F.2d 278, 281 (4th Cir. 1991) ("Irrationality and arbitrariness imply a most stringent standard against which state action is to be measured in assessing a substantive due process claim."). "Only the most egregious official conduct qualifies as constitutionally arbitrary." Snider Int'l, 739 F.3d at 150 (quotation omitted); see also Lewis, 523 U.S. at 847 ("[T]he substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." (quotation omitted)). "To give rise to a substantive due process violation, the arbitrary action must be unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation

---

[9] The right to not have one's liberty or property subjected "to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case," Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 822 (1986), is plainly not implicated by the facts alleged in the complaint, despite plaintiffs' citation to Lavoie. (See Pls.' Resp. (DE 77) at 28). And the court has already found that plaintiffs do not have standing to assert the injuries they claim are caused by state-created danger, as would violate their substantive due process rights. See generally Doe v. Rosa, 795 F.3d 429, 436-37 (4th Cir. 2015) (detailing the state-created danger doctrine).

23

procedural protections or of adequate rectification by any post-deprivation state remedies." Snider Int'l, 739 F.3d at 150. Further, in this context, the "conduct [must be] intended to injure in some way unjustifiable by any government interest." Slaughter v. Mayor & City Council of Baltimore, 682 F.3d 317, 321 (4th Cir. 2012) (explaining that a due process deliberate indifference "standard does not apply to persons in an employment relationship with the government").

Plaintiffs cannot base their claim on the injuries of "adjustment of bills for city owned utility services, the destruction of public records in violation of State law, the racially discriminatory provision of fire inspections, and the racially discriminatory provision of emergency services," (Pls.' Resp. (DE 77) at 33), because, as already stated, they do not have Article III standing to assert such injuries. Thus, they are left with the alleged injury of "the operation of a racially discriminatory operation of a personnel system." (Id. at 34). But the type of injury allegedly caused by defendant David Johnson's use of slurs and racially prejudiced employment condition decision, though reprehensible, is not the type of conscience-shocking injury required for this kind of substantive due process claim. See, e.g., Rochin v. California, 342 U.S. 165, 172-73 (1952) (holding that forced pumping of a criminal suspect's stomach conscience-shocking).

As to plaintiffs' assertion that they have suffered harm to their "good names, reputations, honor, and integrity" cognizable as a substantive due process violation, the facts alleged in the complaint fail to meet the relevant standard. "To state this type of liberty interest claim under the Due Process Clause, a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." Sciolino v. City of Newport News, 480 F.3d 642, 646 (4th Cir. 2007); see also Cannon v. Village of Bald Head Island, 891 F.3d 489, 501 (4th Cir.

2018) (explaining that plaintiff must further allege that this liberty interest was deprived without due process of law).

Here, plaintiffs' complaint does not indicate defendant David Johnson's racial slurs were used in conjunction with any termination or demotion of any of the plaintiffs, with plaintiff Taylor, at most, alleged to have been denied a promotion. See Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 173 n.5 (4th Cir. 1988) ("[A] public employer's stigmatizing remarks do not deprive an employee of a liberty interest unless they are made in the course of a discharge or significant demotion.").

In sum, plaintiffs' § 1983 claim based on the Due Process Clause against defendant David Johnson is dismissed without prejudice.

      b.     Section 1985 Claim

Section 1985 states, in pertinent part, "[i]f two or more persons . . . conspire . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws[,] . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(3).

> To bring a claim under 42 U.S.C. § 1985, a plaintiff must show: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

Thomas v. The Salvation Army S. Territory, 841 F.3d 632, 637 (4th Cir. 2016) (quotation omitted). "[T]he plaintiff must show an agreement or a meeting of the minds by the defendants to violate the plaintiff's constitutional rights." A Soc'y Without A Name v. Virginia, 655 F.3d 342, 346 (4th Cir. 2011) (quotation omitted). The Fourth Circuit has repeatedly and "specifically rejected

section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." See, e.g., id.

Here, on the required element of a conspiracy, plaintiffs allege that

[d]efendants both acted individually and have conspired and acted in concert with each other and their predecessors, have used their authority within the Town of Lucama to discriminate against individuals because of their race and other impermissible bases and have acted arbitrarily to deny and award the benefits and privileges of employment and citizenship on the basis of race and other impermissible bases, to such an extent that such actions have become a policy and practice of the Town of Lucama.

(Compl. ¶ 110). However, this is the sole allegation related to a conspiracy by defendant David Johnson with the other defendants, meaning plaintiffs' claim is "comprised almost entirely of conclusory allegations unsupported by concrete facts." A Soc'y Without A Name, 655 F.3d at 347. Plaintiffs would have the court infer from the other defendants' alleged inaction that they conspired with defendant David Johnson in his alleged invidiously discriminatory conduct, but no concrete facts are alleged to provide plausible support to the existence of a conspiracy beyond mere speculation. Plaintiffs do not point to an alleged meeting of the minds, related to the purported racially discriminatory acts by defendant David Johnson, nor "the specific communications amongst the conspirators, or the manner in which any such communications were made." Id. In sum, plaintiffs rely on allegations of "parallel conduct and a bare assertion of a conspiracy," which do not state a claim under § 1985. See Twombly, 550 U.S. at 556. Thus, plaintiffs' § 1985 claim against defendant David Johnson is dismissed without prejudice.

c.      Section 1982 Claim

Section 1982 states that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. Plaintiffs fail to identify any relevant real or personal property at issue, which they have standing to challenge the deprivation

thereof.  Painter's Mill Grille, LLC v. Brown, 716 F.3d 342, 348 (4th Cir. 2013) ("§ 1982 protects only the right 'to inherit, purchase, lease, sell, hold, and convey real and personal property' on one's own behalf." (quoting 42 U.S.C. § 1982)).  Thus, plaintiffs' § 1982 claim against defendant David Johnson fails and is dismissed without prejudice.

        d.     North Carolina Constitution Claim

The Supreme Court of North Carolina recognizes the ability to "pursue an action directly under the state constitution" where plaintiff's "rights under the North Carolina Constitution have been violated."  Love-Lane v. Martin, 355 F.3d 766, 789 (4th Cir. 2004) (citing Corum v. Univ. of N.C., 330 N.C. 761, 781 (1992)).  However, "[c]laims brought under the North Carolina Constitution may be asserted only against state officials acting in their official capacities." Id. Here, although they have captioned their complaint as brought against defendant David Johnson in his official and individual capacity, plaintiffs specifically assert their claim under the North Carolina Constitution against defendant David Johnson in his individual capacity.  (See Compl. at 31 (describing plaintiffs' "Fourth Cause of Action," "Violation of the North Carolina Constitution," "Against . . . the Individual Defendants in Their Individual Capacit[ies]")).  See generally Graham, 473 U.S. at 165 n.10 ("Personal-capacity actions are sometimes referred to as individual-capacity actions.").  Accordingly, plaintiffs' North Carolina constitutional claim against this defendant fails as a matter of law and is dismissed with prejudice.

        3.     Lucama Defendants' Motion to Dismiss (DE 72)

Plaintiffs' claims of due process violations, actionable under § 1983, and § 1982 and § 1985 violations by the Lucama Defendants suffer the exact same flaws as their same claims against defendant David Johnson.  The same is true of plaintiffs' state constitution claims against the individual defendants in their personal capacities.  Therefore, the court grants on the same basis

the Lucama Defendants' motion to dismiss those claims against them, without prejudice. The court addresses in turn below plaintiffs' remaining claims against the Lucama Defendants.

        a.      Section 1983 Claims

The question of whether the individual Lucama Defendants may be liable for violations of plaintiffs' § 1981 and equal protection rights and whether defendant Town of Lucama may be liable for the same turn on distinct principles of liability, and are therefore addressed separately. Additionally, the court's previously stated conclusion as to the type of injuries alleged in the complaint that plaintiffs have Article III standing to bring and which are cognizable under the Equal Protection Clause and § 1981 applies here as well; that is, racially discriminatory workplace harassment.[10]

        i.      Defendant Town of Lucama's Municipal Liability

As a municipality, (see Compl. ¶ 10), defendant Town of Lucama may not be held liable for merely employing constitutional or statutory tortfeasors under § 1983 — that is, respondeat superior is inapplicable in this context. Monell, 436 U.S. at 691 (explaining that "a [government actor] cannot be held liable solely because it employs a tortfeasor"); Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735-36 (1989) (explaining that a plaintiff bringing a § 1983 claim premised on a § 1981 violation "must show that the violation of his 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of Monell"). Instead, "[a] plaintiff stating a claim via § 1983 for violation of the Equal Protection Clause [or § 1981] by a . . .

_____

[10] In reference to plaintiff Taylor's claim that he was intentionally undertrained to deny him the opportunity for a promotion, the complaint fails to allege facts supporting a conclusion that the individual defendants, other than defendant David Johnson, had the requisite mental state or knowledge regarding that decision and that such a decision is imputable to defendant Town of Lucama under Monell v. Department of Social Services of City of New York's requirement that such conduct be the actionable result of "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. 658, 691 (1978).

municipal entity must show that the harassment was the result of municipal custom, policy, or practice." Feminist Majority Found. v. Hurley, 911 F.3d 674, 700-01 (4th Cir. 2018).

"While municipal policy is most easily found in municipal ordinances, it may also be found in formal or informal ad hoc policy choices or decisions of municipal officials authorized to make and implement municipal policy." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999) (quotation omitted). Further, "official policy can be inferred from a municipality's omissions as well as from its acts." Wellington v. Daniels, 717 F.2d 932, 935-36 (4th Cir. 1983). However, "such omissions are actionable only if they constitute 'tacit authorization' of or 'deliberate indifference' to constitutional injuries." Id. at 936.

If a plaintiff alleges that a municipality is liable under § 1983 for the failure "to put a stop to or correct a widespread pattern of unconstitutional conduct," the "plaintiff must point to a persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." Owens v. Baltimore City State's Att'ys Off., 767 F.3d 379, 402 (4th Cir. 2014); see also Spell v. McDaniel, 824 F.2d 1380, 1387 (4th Cir. 1987) ("Constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them."). Such a claim also requires "[a] sufficiently close causal link between such a known but uncorrected custom or usage and a specific violation," which can be "established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." Spell, 824 F.2d at 1391.

Here, there appears to be no dispute that defendants Jeff Johnson, Mason, Lamm, Best, and David Johnson were the relevant policymakers of the Board that governs defendant Town of

Lucama.  Mikels v. City of Durham, 183 F.3d 323, 334-35 (4th Cir. 1999) ("[T]he City could only be liable for this action by [its employee supervisor]—assuming that its effect was to deprive her of equal protection rights by discriminating against her because of her sex— . . . if in taking the action [the employee supervisor] was acting by express or implied delegation of authority from the City, as its 'policymaker' in matters of personnel management.").  The court concludes that plaintiffs have stated a § 1983 claim for defendant Town of Lucama's municipal liability for a "custom by condonation" that violated by plaintiffs' federal constitutional and statutory rights. See Owens, 767 F.3d at 402.  On the alleged facts, by failing to put a stop to defendant David Johnson's repeated pattern of unconstitutional conduct, defendant Town of Lucama, through its policymakers, has adopted a custom by condonation of those acts, pursuant to which plaintiffs' equal protection and § 1981 rights were violated.

Plaintiffs have alleged defendant Town of Lucama's policymakers' actual knowledge of, and in the case of defendant David Johnson, the actual participation in, persistent and widespread racially charged harassment by a municipal official.  (See also Compl. ¶ 55 ("Town employees complained about [defendant David Johnson's] use of the word [nigger] and the fact that it created a hostile work environment, but Defendant David Johnson continued to use the word to refer to Black/African American individuals.")); cf. Bohen v. City of E. Chicago, 799 F.2d 1180, 1189 (7th Cir. 1986) ("[S]exual harassment was the general, on-going, and accepted practice at the East Chicago Fire Department, and high-ranking, supervisory, and management officials responsible for working conditions at the department knew of, tolerated, and participated in the harassment. This satisfies § 1983's requirement that the actions complained of be the policy or custom of the state entity.").  For example, the complaint alleges that plaintiff Whitehead reported to her supervisors, the Board, in December 2019 that the racial epithets used by defendant David Johnson

were impacting her and other black employees, including plaintiffs Taylor and Hayman, and leaving them feeling threatened. (See Compl. ¶¶ 81-82). Plaintiff Whitehead specifically asked the commissioners of the Board, the relevant policymakers, "to take action to rectify the situation for the employees and citizens of the Town." (Id. ¶ 83).

That same month, relevant policymakers are also alleged to be aware of the tense situation and racially charged atmosphere caused by defendant David Johnson's comments. This can be seen, for example, in defendant Mason's December 2019 comment to plaintiff Whitehead, viewed in the light most favorable to plaintiffs, that "it ha[d] been long enough" since defendant Mason was sworn in as mayor pro tem that she should be able to sign checks for the town, stated in apparent frustration, and that she was "not saying this because of the color of your skin." (See Compl. ¶ 84). See generally Patterson v. Strippoli, 639 F. App'x 137, 140 (3d Cir. 2016) (explaining that, among other "several racially offensive comments [defendant] allegedly made," defendant "remark[ed] that a person who had arrived late to a borough meeting was on 'CPT,' or 'colored people's time'"); Cruz v. Coach Stores, Inc., 202 F.3d 560, 570-71 (2d Cir. 2000) (recounting witness's testimony that defendant's employee "constantly made racially derogatory remarks, including references to . . . 'Colored People's Time'").

The month after plaintiff Whitehead's comment at the closed Board meeting, multiple Town of Lucama residents are alleged to have called for defendant David Johnson "to step down because of his racist remarks" during an open Board meeting on January 6, 2020. (Compl. ¶ 87). Further, a former Board member tendered her resignation at this same meeting because "she could not with a clear conscience sit on the Board of Commissioners 'knowing what they are doing or saying.'" (Id. ¶ 88). At this point, the Board is alleged to "ha[ve] taken no action to discipline [defendant David Johnson, or] remov[e] him from his Commissioner position." (Id. ¶ 89).

Similarly, at a February 3, 2020, meeting, another citizen allegedly "spoke to the Town Board about the use of racial epithets to refer to African American citizens and employees" and "asked the Board of Commissioners how they planned to address the allegations that" racial epithets had been used. (<u>Id.</u> ¶ 90). Finally, although plaintiffs were required to leave the meeting, the individual defendants met with the town attorney to consult about related issues. (<u>See</u> Compl. ¶ 94; <u>see also</u> <u>id.</u> ¶ 80 (explaining that the same town attorney "had spent over two hours . . . talking to [defendant David Johnson] about the need for [him] to stop making racists remarks about African Americans and creating a hostile work environment")).

In sum, the complaint alleges actual and/or constructive knowledge by defendant Town of Lucama's policymakers of the alleged unconstitutional practice of municipal official and defendant David Johnson of creating a racially hostile work environment through his repeated use of racial epithets in the workplace to describe citizens and employees. <u>See, e.g.</u>, <u>Spell</u>, 824 F.2d at 1391 ("Constructive knowledge may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these.").

Further, plaintiffs have alleged facts from which a reasonable inference can be drawn that the duration and frequency of this conduct was widespread and recurrent. Construing the facts contained in the complaint in the light most favorable to plaintiffs, the conduct was long in duration, approximately two years in length. (<u>See</u> Compl. ¶ 89 (describing former board member's alleged statement that since 2017, when she and plaintiff Uzzell ran for office, "the use of the 'N-word' had surfaced as an ongoing issue"). Such conduct is also alleged to have been fairly frequent and flagrant, with a handful of egregious incidents occurring in one specific month, October 2019. <u>Cf.</u> <u>Boyer-Liberto</u>, 786 F.3d at 280 (explaining in the Title VII context that alleged

32

supervisor's "two uses of the 'porch monkey' epithet—whether viewed as a single incident or as a pair of discrete instances of harassment—were severe"). At this stage in litigation, the alleged factual matter in the complaint is such that it is plausible that the duration and frequency of the alleged unconstitutional conduct was so widespread and recurrent that defendant Town of Lucama's failure to address such "could qualify as 'deliberate indifference.'" See Owens, 767 F.3d at 403.

Finally, although later evidence may prove otherwise, plaintiffs have alleged sufficient facts to "nudg[e] [their] claims" of a causal link between the alleged custom by condonation and the specific violations of their constitutional rights by defendant David Johnson "across the line from conceivable to plausible." See Iqbal, 556 U.S. at 680. The complaint alleges that current policymakers "refuse[d] to censure or remove [defendant David] Johnson from his position on the Board of Commissioners." (Compl. ¶ 28). As a matter of pleading, this taken together with other similar allegations of continued inaction, (see, e.g., Compl. ¶ 52 ("[F]or years Defendant Johnson has used racist epithets towards African and other non-White Americans."), ¶ 54-55 (alleging that, around April of 2019, "Town employees complained about [defendant David Johnson's] use of the word . . . but [d]efendant David Johnson continued to use the word . . . ."), ¶ 89 ("Since the issue" of "the use of the 'N-word'" "had arisen, the Board had taken no action to discipline [d]efendant [David] Johnson[ or] removed him from his Commissioner position . . . ."), alleges that the occurrence of the specific violations by defendant David Johnson was made reasonably probable by an alleged continuing custom by condonation of defendant Town of Lucama. Cf. Feminist Majority Found., 911 F.3d at 703 ("[Defendant] responded to that harassment with deliberate indifference, in that he had the authority to address and curtail the harassment but failed to do so over a period of months."); Jennings, 482 F.3d at 701-02 (explaining that based on

33

plaintiff's proffered evidence a jury could find "'an affirmative causal link' between [defendant-supervisor's] inaction and [plaintiff's] constitutional injury")

Although it, of course, remains to be seen whether plaintiffs will prevail on the merits of their § 1983 claim, they have sufficiently alleged such a claim here. Because plaintiffs' complaint contains factual allegations raising their right to relief under § 1983 against defendant Town of Lucama above a speculative level, the court denies defendant Town of Lucama's motion to dismiss those claims against it.

Defendant Town of Lucama argues that "Section 1983 liability cannot 'be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees.'" (Lucama Defs.' Reply (DE 80) at 5 (quoting Milligan v. City of Newport News, 743 F.2d 227, 230 (4th Cir. 1984))). However, as Milligan stated, "custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees," 743 F.2d at 229-30, the principle discussed above. Here, just as in Owens, where the court concluded that an allegation "[t]hat [municipal officials] withheld information on multiple occasions could establish a persistent and widespread pattern of practice," 767 F.3d at 403, plaintiffs' allegations of multiple specific occasions of flagrantly racially discriminatory activity by a municipal official that purportedly spanned multiple years make a plausible claim of a persistent and widespread unconstitutional pattern of practice.

Defendant Town of Lucama further seeks to analogize the instant case to Brown v. Bratton, No. CV ELH-19-1450, 2020 WL 886142 (D. Md. Feb. 21, 2020), in which a district court dismissed a portion of plaintiff's claims for a racially hostile work environment, including his claim against the county employing the alleged harasser. There, the court concluded that "the Complaint fails to allege widespread conduct by County employees that could support the

34

inference that County policymakers were aware of and tacitly condoned racial discrimination by failing to discipline [county] employees. Rather, plaintiff focuses on his relationship with [the alleged harasser]. And, although plaintiff alleges that he complained to [county employees], it is not apparent that either [county employee] exert[s] final policymaking authority over personnel decisions." Id. at *35. Here, plaintiffs allege the actual knowledge of the relevant policymakers of the purported unconstitutional conduct and actual participation by a relevant policymaker. Unlike Brown, where "the only allegations in the Complaint concerning an unconstitutional policy, practice, or custom [were] '[t]hreadbare recitals of the elements of a cause of action," id. (quoting Iqbal, 556 U.S. at 678), the complaint contains non-conclusory factual assertions that raise plaintiffs' right to relief about a speculative level. Therefore, plaintiffs state a § 1983 claim against defendant Town of Lucama for violations of their equal protection and § 1981 rights.[11]

> ii.  Individual Lucama Defendants' Supervisory Liability in Their Personal Capacity

Plaintiffs also assert their § 1983 claims against defendants Jeff Johnson, Mason, Lamm, and Best in their personal capacities. The complaint does not allege facts supporting a necessary element that these officials acted directly and "personally in the deprivation of the plaintiff[s'] rights." See Wright, 766 F.2d at 850. Yet, in certain circumstances, an individual may be liable as a supervisor. See, e.g., Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994); Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984) ("[S]upervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict . . . ."). But see also Iqbal, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."). However, the complaint

---

[11]    For the same reasons that plaintiffs' assertion of § 1981 retaliation by defendant David Johnson fails, despite the viability of the rest of their § 1983 claim against him, so too does any claim of § 1981 retaliation by defendant Town of Lucama.

does not allege facts to support an inference that defendants Jeff Johnson, Mason, Lamm, and Best supervised defendant David Johnson in the role in which he is alleged to have acted unconstitutionally.  Cf. Brandon v. Kinter, 938 F.3d 21, 37 (2d Cir. 2019) (explaining that because certain "defendants [were] not supervisory officials, . . . [the court] considers only whether they participated directly in the violation" as opposed to engaging in further supervisor liability analysis).

Further, these individual defendants are qualifiedly immune on the facts pleaded.  "To overcome an official's claim of qualified immunity, the plaintiff must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'"  Attkisson v. Holder, 925 F.3d 606, 623 (4th Cir. 2019) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)).

The law "'do[es] not require a case directly on point' for a right to be clearly established, [but] 'existing precedent must have placed the statutory or constitutional question beyond debate.'" White v. Pauly, 137 S. Ct. 548, 551 (2017) (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)). "'[C]learly established law' should not be defined 'at a high level of generality.'" Id. at 552 (quoting al-Kidd, 563 U.S. at 742).  "Rather, the 'clearly established law must be particularized to the facts of the case.'" Safar v. Tingle, 859 F.3d 241, 246 (4th Cir. 2017) (quoting Pauly, 137 S. Ct. at 552).

The particularized and relevant right at issue here is plaintiffs' right to be free from a racially discriminatory hostile work environment allegedly caused by the individual defendants' deliberately indifferent inaction in their roles as co-supervisor with the allegedly discriminatory supervisor.  That particular right's existence has not been placed beyond debate by existing precedent on the Equal Protection Clause or § 1981.  In pointing to an ostensibly clearly established

36

right to be free of "intentional discrimination in the provision of the terms and conditions of employment by public employer," (Pl.'s Resp. (DE 77) at 16), plaintiffs rely on too general a right, for the purposes of the qualified immunity analysis. Plaintiffs fail to state a claim against these defendants, and therefore such claims against them are dismissed without prejudice.

> b. Title VII Claim Against Defendant Town of Lucama

Plaintiffs allege that defendant Town of Lucama violated Title VII's strictures by discriminating against them on the basis of their race and by creating a racially hostile work environment. However, on the facts alleged, Title VII is inapplicable to defendant Town of Lucama.

"Title VII renders it 'an unlawful employment practice for <u>an employer</u> . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." <u>Boyer-Liberto</u>, 786 F.3d at 276-77 (emphasis added) (alteration and omission in original) (quoting 42 U.S.C. § 2000e–2(a)(1)). Title VII defines employer as "an industry affecting commerce who has fifteen or more employees." 42 U.S.C. § 2000e(b); <u>see also</u> <u>Depaoli v. Vacation Sales Assocs., L.L.C.</u>, 489 F.3d 615, 622 (4th Cir. 2007) ("[E]mployers with less than 15 employees . . . are presumed to be exempt from Title VII's requirements by virtue of § 2000e(b).").

Plaintiffs' complaint alleges that defendant Town of Lucama has 11 full-time employees, (Compl. ¶ 10), and their charges to the EEOC all indicated that defendant Town of Lucama employed less than 15 employees, (Pls.' EEOC Charges (DE 73-1) at 1-4). To meet Title VII's numerosity requirement, plaintiffs point to defendant Fire Department's seven part-time firefighter employees, who are provided compensation by defendant Town of Lucama, asserting they are

each jointly employed by the two separate entities of defendant Fire Department and defendant Town of Lucama.

The Fourth Circuit has found that the "joint employment doctrine is an appropriate construction of Title VII." See Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404, 408 (4th Cir. 2015). However, the instant situation implicates "the somewhat different, but related, question [of] whether employees of different entities may be aggregated under . . . the joint employer doctrine[] to satisfy Title VII's fifteen-employee threshold," see Arculeo v. On-Site Sales & Mktg., LLC, 425 F.3d 193, 198 (2d Cir. 2005), which the Fourth Circuit has not answered, see, e.g., Wright v. Mountain View Lawn Care, LLC, No. 7:15-CV-00224, 2016 WL 1060341, at *4 (W.D. Va. Mar. 11, 2016) ("The Fourth Circuit has not addressed whether the joint employment theory permits aggregation of employees to meet the employee threshold for Title VII liability."). Because the weight of authority indicates that aggregation under this doctrine is likely permissible, see, e.g., Arculeo, 425 F.3d at 199-200; Virgo v. Riviera Beach Assocs., Ltd., 30 F.3d 1350, 1361 (11th Cir. 1994); Sanford v. Main St. Baptist Church Manor, Inc., 327 F. App'x 587, 594 (6th Cir. 2009); EEOC Compliance Manual: Threshold Issues § 2–III(B)(1)(a)(iii) (May 12, 2000), the court assumes for the sake of resolving this motion that the doctrine may be used to aggregate jointly employed employees towards Title VII's numerosity requirement. However, the specific inquiry is whether defendant Town of Lucama is alleged to jointly employ the requisite number of specific individual firefighters, rather than an inquiry into whether defendants Town of Lucama and Fire Department are joint employers generally. See, e.g., Butler, 793 F.3d at 412 (describing the relevant inquiry as "assessing whether an individual is jointly employed by two or more entities").

The Fourth Circuit has articulated the following nine factors to guide whether individuals are jointly employed by two or more entities:

(1) authority to hire and fire the individual;

(2) day-to-day supervision of the individual, including employee discipline;

(3) whether the putative employer furnishes the equipment used and the place of work;

(4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;

(5) the length of time during which the individual has worked for the putative employer;

(6) whether the putative employer provides the individual with formal or informal training;

(7) whether the individual's duties are akin to a regular employee's duties;

(8) whether the individual is assigned solely to the putative employer; and

(9) whether the individual and putative employer intended to enter into an employment relationship.

Id. at 414. "[N]one of these factors are dispositive and . . . the common-law element of control remains the 'principal guidepost' in the analysis." Id. However, the three "most important" factors are "power to hire and fire the putative employee," "to what extent the employee is supervised," and "where and how the work takes place." Id.

Here, the complaint, despite plaintiffs' assertion to the contrary, fails to include requisite factual matter to plausibly state that defendant Town of Lucama jointly employed at least four of the volunteer firefighters as to meet Title VII's numerosity requirement. The complaint does allege that defendant "Town provide[s] worker's compensation and 'payroll'" for defendant Fire Department's part-time firefighters. (Compl. ¶ 10). However, this only goes to the factor of possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes. The complaint fails to include factual allegations regarding the presence of any of the other factors and, more importantly, the necessary control over defendant Fire

39

Department employees by defendant Town of Lucama to suggest that those individuals are jointly employed.

The allegation that the "Town Board of Commissioners hires and fires all Town employees is," of course, irrelevant to the question of whether defendant Town of Lucama hires and fires the volunteer fire department's firefighters. Nor is the fact that defendant David Johnson is alleged to serve as a Board member and as the chief of defendant Fire Department conclusive. His ability to hire and fire, although it is not clear from the complaint that he can, volunteer firefighters in his official capacity as fire chief does not speak to defendant Town of Lucama's, through its Board, ability to do the same. The complaint fails to indicate, for example, by including allegations regarding the other eight Butler factors, that defendant Town of Lucama exercised any sort of meaningful control over defendant Fire Department's employees such that defendant Town of Lucama would be considered a principal of those putative agents under the law of agency. See Butler, 793 F.3d at 409 ("[E]mphasis on determining which entities actually exercise control over an employee is consistent with Supreme Court precedent interpreting Title VII's definitions.").

Accordingly, because the complaint lacks sufficient factual matter indicating that defendant Town of Lucama employed 15 or more employees, a statutory requisite for Title VII's applicability, those claims against defendant Town of Lucama are dismissed without prejudice.

   c.  North Carolina Constitution Claim Against Defendant Town of Lucama

As previously stated, North Carolina courts recognizes "a direct cause of action under the State Constitution against defendant" officials "in [their] official capacit[ies] for alleged violations of" of state constitutional rights. Corum, 330 N.C. at 783. Since a "[c]laim[] brought under the North Carolina Constitution may be asserted only against state officials acting in their official capacities" and since a "claim against [a government official] in his official capacity . . . is

40

essentially a claim against" the entity for which he works, the court assumes that plaintiffs permissibly may bring a claim under the state constitution against defendant Town of Lucama, a government entity.  See Love-Lane, 355 F.3d at 783, 789.

However, at the outset, plaintiffs' state constitutional claims suffer the infirmity of failing to cite a relevant portion of the North Carolina Constitution that defendant Town of Lucama is alleged to have violated.  "Sections 1, 2, 19, and [sic] 32, and 36" are alleged to have been violated, without reference to a specific article of the state constitution. (Compl. ¶ 134).  This is problematic as North Carolina's Constitution is broken first into articles then into sections, just as the federal constitution.  Compare N.C. Const. art. I, § 1, with U.S. Const. art. I, § 1.  The court goes forward in its analysis under the assumption that plaintiffs intended to cite sections from Article One of the North Carolina Constitution, that is, the sections of that article regarding "the equality and rights of persons," "sovereignty of the people," "the law of the land; equal protection of the laws," "exclusive emoluments," and "other rights of the people."  N.C. Const. art. I, §§ 1, 2, 19, 32, 36.

However, "a plaintiff whose rights under the North Carolina Constitution have been violated may pursue an action directly under the state constitution only if there is no other remedy under state law to redress the violation."  Love-Lane, 355 F.3d at 789.  Accordingly, "[t]o assert a direct constitutional claim . . . a plaintiff must allege that no adequate state remedy exists to provide relief for the injury."  Copper v. Denlinger, 363 N.C. 784, 788 (2010) (emphasis added).  "[A]n adequate remedy" is one that "provide[s] the possibility of relief under the circumstances."  Craig ex rel. Craig v. New Hanover Cty. Bd. of Educ., 363 N.C. 334, 340 (2009).  Plaintiffs have failed to so allege or put forth factual matter from which such an inference could be made.  Accordingly, their state constitutional claims against defendant Town of Lucama are dismissed without prejudice.

41

4.      Defendant Fire Department's Motion to Dismiss (DE 70)

Initially, as with the Lucama Defendants, plaintiffs' claims of due process violations, actionable under § 1983, and of § 1982 and § 1985 violations by defendant Fire Department suffer the exact same flaws as their similar claims against defendant David Johnson.  Likewise, plaintiffs' claims of state constitutional violations by defendant Fire Department suffer from the same factual infirmities as their same claims against defendant Town of Lucama.  Accordingly, the court grants in these same parts defendant Fire Department's motion to dismiss, without prejudice.  It addresses in turn below plaintiffs' remaining claims against this defendant.

a.      Section 1983 Claims

As the court has already stated, the only Article III cognizable injuries plaintiffs have alleged that they suffered stem from their employment.  Yet, those injuries must also meet "irreducible constitutional minimum" of being "fairly . . . traceable to the challenged action of the defendant, and not the result of the independent action of some third party."  See Lujan, 504 U.S. at 560; see also Bostic v. Schaefer, 760 F.3d 352, 370-71 (4th Cir. 2014) ("Plaintiffs' claims can . . . survive . . . [a] standing challenge as long as one [plaintiff] satisfies the standing requirements with respect to each defendant. (emphasis added)).

Here, plaintiffs' injuries are not fairly traceable to any conduct by defendant Fire Department nor do plaintiffs challenge any conduct by defendant Fire Department.  Instead, the complaint, as it relates to the injuries suffered in fact by plaintiffs, relies on the fact that defendant David Johnson was the chief of defendant Fire Department as the alleged basis for the organization's liability.  Yet, plaintiffs' cognizable employment-related injuries were not caused by defendant David Johnson in his role as chief of defendant Fire Department but, allegedly, as a supervisor of plaintiffs in his role as a Board member.

42

In addition, and in the alternative, plaintiffs' § 1983 claims, based on equal protection and § 1981 violations, against defendant Fire Department fail due to the lack of sufficient factual matter in the complaint. In his role as fire chief, defendant David Johnson's conduct would be beyond the scope of the § 1983 hostile work environment claim, anchored by Title VII principles, discussed above, and, therefore, cannot support such a claim. Further, even assuming that the principle of joint employment liability is applicable to § 1983 employment discrimination claims, as would import defendant Town of Lucama's conduct to defendant Fire Department, see also Borrell v. Bloomsburg Univ., 870 F.3d 154, 161 (3d Cir. 2017) (explaining that "the fact that [an entity] was a joint employer does not answer the question of whether" that entity engaged in state action, as required for a § 1983 claim), plaintiffs have failed to include related factual matter in their complaint. Plaintiffs' pleadings lack non-conclusory, fulsome factual allegations to support a reasonable inference defendant Fire Department jointly employed plaintiffs along with defendant Town of Lucama; none of the nine factors listed previously are implicated in regard to the relationship between defendant Fire Department and plaintiffs as it is described in the complaint. In sum, the complaint fails to allege facts upon which a § 1983 claim could grant plausible relief for plaintiffs against defendant Fire Department. Therefore, this claim is dismissed without prejudice.

b.    Title VII Claim

While many of the legal standards applicable to § 1983 and § 1981 claims in the employment context mirror those of Title VII, Title VII contains an administrative exhaustion requirement that the two civil rights statutes do not. And this requirement necessitates that the court dismiss plaintiffs' Title VII claim against defendant Fire Department.

43

"An individual alleging discrimination in violation of Title VII must first file an administrative charge with the EEOC." Chacko v. Patuxent Inst., 429 F.3d 505, 508 (4th Cir. 2005) (citing 42 U.S.C § 2000e-5(e)); see also id. at 509 ("An individual cannot bring suit until he has exhausted the administrative process." (citing 42 U.S.C. § 2000e-5(b), (f)(1))).[12]  "[C]laims raised under Title VII [that] exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof . . . are procedurally barred." Dennis, 55 F.3d at 156.  Accordingly, the Title VII claim in the complaint typically must charge conduct "by the same actor" as the EEOC charge or elsewise by barred by a failure to exhaust.  See Sydnor v. Fairfax County, 681 F.3d 591, 594 (4th Cir. 2012); accord Kersting v. Wal-Mart Stores, Inc., 250 F.3d 1109, 1118 (7th Cir. 2001) ("The EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals." (quotation omitted)).

Here, plaintiffs' EEOC charges name as their employer only "Town of Lucama, NC." (See Pls.' EEOC Charges (DE 73-1) at 1-4).[13]  In their charges, they do not mention, describe, or imply that defendant Fire Department, an independent and separately incorporated entity, employed

---

[12]    Plaintiffs are correct that the Supreme Court held in Fort Bend County v. Davis that Title VII's charge-filing requirement is not jurisdictional and is instead a mandatory processing rule.  See 139 S. Ct. 1843, 1851 (2019). However, the Court still recognized that such "a claim-processing rule" is "'mandatory' in the sense that a court must enforce the rule if a party 'properly raise[s]' it." Id. at 1849 (quoting Eberhart v. United States, 546 U.S. 12, 19 (2005) (per curiam)). Here, defendant Fire Department properly raises Title VII's mandatory claim processing rule as part of its Rule 12(b)(6) motion to dismiss, and such can serve as a basis for dismissing plaintiffs' claims.

[13]    In considering a Rule 12(b)(6) motion, a court "may consider the complaint itself and any documents that are attached to it," CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 154 (4th Cir. 2009), as well as a document attached to defendants' motions to dismiss "if [the document] was integral to and explicitly relied on in the complaint and if the plaintiff[] do[es] not challenge its authenticity." Am. Chiropractic v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004) (quotation omitted).  Where the document attached to a defendant's motion to dismiss meets the "integral to" and unchallenged authenticity standard, "the district court properly treat[s] [the document] as if it had been attached to the complaint." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016). Here, the complaint specifically references "plaintiffs timely fil[ing] charges of race discrimination and retaliation with the Equal Employment Opportunity Commission," satisfying the requirement that the charges are integral and explicitly relied on in the complaint. (See Compl. ¶ 25).  Plaintiffs do not challenge the authenticity of those documents in their response.

44

plaintiffs or point to any conduct by defendant Fire Department. Accordingly, plaintiffs' Title VII claims against defendant Fire Department are procedurally barred by Title VII's mandatory processing rule. The court dismisses those claims with prejudice.

## CONCLUSION

Based on the foregoing, the following claims are allowed to proceed:

1. Plaintiff Taylor's failure to promote claim under § 1983 against defendant David Johnson;

2. Plaintiffs' hostile work environment claims under § 1983 against defendant David Johnson;

3. Plaintiffs' hostile work environment claims under § 1983 against the Town of Lucama.

The following claims are dismissed without prejudice:

1. Plaintiffs' claims based on alleged injuries caused to non-parties, due to the court's lack of subject matter jurisdiction;

2. Plaintiffs' claims of § 1981 retaliation under § 1983 against defendants David Johnson and the Town of Lucama;

3. Plaintiffs' claims of due process violations under § 1983 against all defendants;

4. Plaintiffs' § 1985 claims against all defendants;

5. Plaintiffs' § 1982 claims against all defendants;

6. Plaintiffs' § 1983 claims against defendants Jeff Johnson, Mason, Lamm, and Best;

7. Plaintiffs' Title VII claim against defendant Town of Lucama;

8. Plaintiffs' state constitution claims against defendants the Town of Lucama and the Fire Department;

9. Plaintiffs' § 1983 claims against defendant Fire Department.

Finally, the following claims are dismissed with prejudice:

1. Plaintiffs' state constitution claims against the individual defendants;

2. Plaintiffs' Title VII claim against defendant Fire Department.

As no claims remain against them, the clerk is DIRECTED to terminate defendants Jeff Johnson, Mason, Lamm, Best, and the Fire Department as parties to this case.

The stay (DE 58) on the deadlines announced in the court's August 26, 2020, initial order is LIFTED. As described in that order, the Rule 26(f) conference must occur on or before 21 days from entry of this order, and mandatory initial disclosures required by Rule 26(a)(1) must be made within 14 days after the Rule 26(f) conference. Additionally, the report and plan described in court's initial order shall be filed with the court within 14 days of that conference. All other terms and conditions in the court's August 26, 2020, initial order, not altered herein, shall remain in full force and effect.

SO ORDERED, this the 20th day of September, 2021.

LOUISE W. FLANAGAN
United States District Judge

46